## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ROBERT BALES,**

      **Petitioner,**

      **v.**                            **CASE NO.  19-3112-JWL**

**COMMANDANT, U.S. Disciplinary Barracks,**

      **Respondent.**

### MEMORANDUM AND ORDER

This matter is a petition for habeas corpus filed under 28 U.S.C. § 2241.  Petitioner is confined at the United States Disciplinary Barracks at Fort Leavenworth, Kansas.  Petitioner seeks to set aside his 2013 convictions by general court-martial.  Because the military courts fully and fairly reviewed all of Petitioner's claims, the petition for habeas corpus must be denied.

## I.  FACTUAL BACKGROUND

Petitioner, a former active duty member of the United States Army, was convicted by general court-martial at Joint Base Lewis-McChord, Washington.  The Army Court of Criminal Appeals ("ACCA") summarized the underlying facts as follows:

> Appellant was deployed to Afghanistan and was stationed at VSP Belambay.  In the early morning hours of 11 March 2012, appellant left VSP Belambay and travelled to the village of Alikozai.  Appellant was armed with his M4 rifle, H&K 9 millimeter pistol, advance combat helmet with night vision device, one full magazine containing thirty 5.56mm rounds for his M4 and one magazine containing fifteen 9mm rounds for his H&K pistol. While in Alikozai, appellant killed four people by shooting them at close range, which included two elderly men, one elderly woman and one child. Appellant also assaulted six people, which included one woman and four children.

When appellant ran low on ammunition, he returned to VSP Belambay to obtain additional ammunition. Appellant left VSP Belambay for a second time, this time armed with his M4 rifle, 9mm H&K pistol, M320 grenade launcher with accompanying ammunition belt, night vision device and ammunition for all of his weapons. Walking south, appellant entered the village of Naja Bien. While in Naja Bien, appellant entered a home where a family was sleeping.  Appellant pulled a man from the home to an adjacent courtyard, where he killed the man in front of his family by shooting him at close range. Appellant then entered another home where a different family was sleeping. With the fire selector switch on his M4 set for three-round bursts, he shot ten people in the head at close range, which included three women and six children.  Appellant then grabbed a kerosene-filled lantern from the floor, emptied the contents onto the bodies of the individuals he had just murdered, lit a match and set the bodies on fire.  As he was leaving, appellant shot an elderly woman in the chest and head at close range with his 9mm. The woman did not die from being shot so appellant crushed her skull with his boot, stomping with so much force that her face and head were mutilated.

As appellant was returning to VSP Belambay, he was met by three soldiers. The soldiers seized appellant's M4 rifle, M320 grenade launcher, H&K 9mm pistol, numerous magazines and ammunition for those three weapons as well as appellant's helmet, night vision device, and a large piece of blue decorative fabric that appellant had taken from one of the homes and was wearing on his back. Appellant's clothes were soaked in blood.

Appellant was escorted to the Operations Center, were he was guarded by two soldiers until special agents from the Criminal Investigation Command (CID) arrived. While being guarded, appellant made several statements to include: "I thought I was doing the right thing," "I'm sorry that I let you guys down," "My count is twenty," "It's bad, it's really bad," and "We should have hit them harder."

When CID arrived, the special agents seized appellant's computer, clothing, weapons, and ammunition. They also discovered and seized anabolic steroids that appellant had hidden under the boardwalk outside of his room.

*United States v. Bales*, ARMY 20130743, 2017 WL 4331013, at *1–2 (A. Ct. Crim. App. Sept. 27, 2017).

A military judge sitting as a general court-martial, convicted Petitioner, pursuant to his pleas, of sixteen specifications of premeditated murder, six specifications of attempted murder, one specification of violating a lawful general order, one specification of wrongfully using a Schedule II controlled substance, four specifications of intentional infliction of grievous bodily harm, one specification of assault with a dangerous weapon, one specification of assault consummated by battery,[1] and one specification of wrongfully burning bodies, in violation of Articles 80, 92, 112a, 118, 128, and 134, UCMJ, 10 U.S.C. §§ 880, 912a, 918, 928, 934 (2012). *Id*. at *1.  The panel sentenced Petitioner to be reduced to the most junior enlisted grade of Private (E-1), to forfeit all pay and allowances, to be confined for life without eligibility of parole, and to be dishonorably discharged from the Army.  *Id*.  The military judge credited Petitioner with 527 days' confinement credit against his sentence to confinement.  The convening authority approved the sentence.[2]

On September 27, 2017, the ACCA denied each of Petitioner's assignments of error brought pursuant to 10 U.S.C. § 866 (2012). *Id*.  On February 15, 2018, the U.S. Court of Appeals for the Armed Forces ("CAAF") granted Petitioner's petition for grant of review and affirmed the decision of the ACCA.  *United States v. Bales*, 77 M.J. 268 (C.A.A.F. Feb. 15, 2018).[3]  On June 25, 2018, the United States Supreme Court denied Petitioner's petition for writ of certiorari.  *Bales v. United States*, 138 S. Ct. 2692 (2018).

Petitioner brings the instant petition under § 2241, arguing that his conviction and sentence should be vacated and set aside, and that the Court should order a new trial.

---

[1]  The ACCA noted that in February 2012, Petitioner assaulted an Afghan truck driver in front of several junior enlisted soldiers.

[2]  The convening authority temporarily deferred the reduction in rank and the adjudged forfeitures.  The automatic forfeitures of all pay and allowance were further waived for a period of six months with direction that these funds be paid for the benefit of Petitioner's wife and children.  *Id*.

[3]  In a footnote, the court "directed that the court-martial order be corrected to reflect that Appellant pleaded guilty to Charge III, Specification 7, and Charge VI."

## II.  CLAIMS PRESENTED

Petitioner argues that this Court should determine that the military courts addressed two issues in a manner that fails to survive constitutional scrutiny.  (Doc. 21, at 2.)  Petitioner claims that:

> First, the military courts failed to address adequately [Petitioner's] ingestion of the drug mefloquine and its impact on his case. Before the military courts, and before this court, is evidence that mefloquine adversely impacted virtually every aspect of this case—from [Petitioner's] ability to possess the *mens rea* to commit premeditated murder, to his competence to enter a guilty plea, to whether the jury should have been able to evaluate the impact of mefloquine when imposing a sentence.   And the remedy [Petitioner] has sought here is simple and fair:  a remand with an order to conduct a fact-finding hearing to determine whether at the time of the killings [Petitioner] was suffering from mefloquine intoxication.
>
> Second, the military courts erred in blocking [Petitioner's] evidence that certain Afghan witnesses flown into the United States to testify against him, whom the Government described as farmers and gardeners, were actually terrorist bomb-makers.  Not only did the prosecution fail to disclose certain DNA and fingerprint evidence indicating that the witnesses were connected to terrorist attacks, but, when the defense team found it, the prosecutors fought to keep the evidence out of the view of the jury. The trial judge assented to the prosecution's position, and the military appellate courts endorsed the trial judge's decision with barely a passing reference to the issue.  Had this evidence been admitted, it could have resulted in the jury allowing [Petitioner] the opportunity for parole sometime in his life.  The military court's cursory appellate review of such an important issue cannot rise to the level of "full and fair consideration" as that standard has been delineated by the cases in this Circuit.

*Id*. at 2–3.[4]

---

[4] To the extent that Petitioner alleges in his Petition (Doc. 1, at 16) that the trial judge refused his request to conduct a *Kastigar* hearing and to recuse the judge and prosecutors, he appears to have abandoned this issue in his Traverse. *See Showalter v. McKune*, No. 08-3228-KHV, 2009 WL 2969488, at n.1 (D. Kan. Sept. 11, 2009) (noting the court does not address ground for relief subsequently abandoned in Traverse).  Regardless, as pointed out in the Answer, the trial court conducted a "*Kastigar*-like" inquiry prior to sentencing and allowed Petitioner to request a *Kastigar*

## III.  STANDARD OF REVIEW

A federal court may grant habeas corpus relief where a prisoner demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c).  However, the Court's review of court-martial proceedings is very limited.  *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th Cir. 2010).  The Supreme Court has explained that "[m]ilitary law, like state law, is a jurisprudence which exists separate from the law which governs in our federal judicial establishment," and "Congress has taken great care both to define the rights of those subject to military law, and provide a complete system of review within the military system to secure those rights."  *Nixon v. Ledwith*, 635 F. App'x 560, 563 (10th Cir. Jan. 6, 2016) (unpublished) (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953)).

Any claims that were not presented to the military courts are deemed waived.  *Id.* (citing *Roberts v. Callahan*, 321 F.3d 994, 995 (10th Cir. 2003)).  For those claims presented to the military courts, this Court must determine whether those courts "fully and fairly reviewed" each claim.  *Id.*  If a claim was presented but not given full and fair consideration, then "the scope of review by the federal civil court expand[s]."  *Id.* (citing *Lips v. Commandant*, 997 F.2d 808, 811 (10th Cir. 1993)).

The Tenth Circuit has set forth the following four-part test to aid in determining whether the claims were fully and fairly considered:

> To assess the fairness of the consideration, our review of a military conviction is appropriate only if the following four conditions are met: (1) the asserted error is of substantial constitutional dimension, (2) the issue is one of law rather than disputed fact, (3) no military considerations warrant a different treatment of constitutional claims, and (4) the military courts failed to give

---

hearing at sentencing; Petitioner waived the issue of whether the trial court should have conducted a *Kastigar* hearing (he did not request a hearing at sentencing); and, even if the issue were not waived, the inadvertently-disclosed information had no effect on the proceedings.  (Doc. 6, at 22–24.)

> adequate consideration to the issues involved or failed to apply
> proper legal standards.

*Squire v. Ledwith*, 674 F. App'x 823, 826 (10th Cir. 2017) (unpublished) (quoting Thomas, 625 F.3d at 670–71 (citing *Dodson v. Zelez*, 917 F.2d 1250, 1252–53 (10th Cir. 1990)). The test "develops our understanding of full and fair consideration" to determine "whether the federal court may reach the merits of the case." *Squire*, 674 F. App'x at 827 (citing *Roberts*, 321 F.3d at 997). "While we continue to apply this four-part test, [we] have emphasized the fourth consideration as the most important." *Squire*, 674 F. App'x at 826 (quoting *Thomas*, 625 F.3d at 671).

"An issue has been given full and fair consideration when it has been briefed and argued at the military court, even if that court summarily disposed of the issue." *Williams v. Ledwith*, 671 F. App'x 719, 721 (10th Cir. 2016) (unpublished) (citing *Roberts*, 321 F.3d at 997; *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir. 1986)); *see also Squire*, 674 F. App'x at 826 ("Even a military court's summary disposition of a claim can show adequate consideration of the issues involved."); *Burke v. Nelson*, 684 F. App'x 676, 680 (10th Cir. 2017) (unpublished) (citing Watson, 782 F.2d at 145) ("[W]hen it comes to court-martial rulings on constitutional claims, our review is sharply limited: so long as the claim was briefed and argued before a military court, we must deny the claim.").

The petitioner has the burden to show that a military review was "legally inadequate" to resolve his claims. *Williams*, 671 F. App'x at 721 (citing *Watson*, 782 F2d at 144 (quotation omitted)).

## IV. ANALYSIS

Petitioner argues that the military courts failed to adequately address his ingestion of the drug mefloquine and its impact on his case. The ACCA found that although Petitioner waived

the defense of voluntary intoxication at his guilty plea, on appeal he argued that "the government failed to provide him with information that he had been prescribed an anti-malaria medication called Lariam, also known by its chemical component name mefloquine hydrochloride." *Bales*, 2017 WL 4331013, at *7.  The ACCA found in part that:

> To support his claim, appellant submitted an affidavit from a noncommissioned officer who believed appellant was prescribed Lariam.  Appellant also provided an affidavit from Dr. Remington Nevin, a medical expert retained by appellant in 2017, who similarly believed appellant was exposed to Lariam during his deployment to Iraq in 2003–2004.  Appellant concedes his medical records are void of any information about him being prescribed Lariam.  Instead, appellant's medical records indicate he was prescribed a different anti-malaria medication, doxycycline hyclate, on 4 October 2011 and the prescription was last refilled on 11 April 2012.

*Id*.  The ACCA found that based on these facts, Petitioner made a two-fold assumption: "First, he surmises that since a full bottle of doxycycline was collected among his personal effects after the charged offenses, he could not have been taking doxycycline.  Second, he assumes he must have been taking Lariam as an alternative anti-malarial medication."  *Id*. at *8.  The ACCA found that Petitioner "did not submit an affidavit claiming he ingested Lariam, nor did he provide an affidavit from any person that saw him take Lariam."  *Id*.

The ACCA noted that the government filed a motion to preclude evidence that Petitioner ingested Lariam in response to Petitioner's admission that he was not aware of any medical records suggesting he was prescribed Lariam.  *Id*.  The military judge, at the hearing on this motion, stated "my understanding of that is that the defense doesn't intend to offer any evidence about the drug [Lariam] at all.  That was my understanding of the defense's response."  *Id*.  To which the defense responded, "That's correct, Your Honor."  *Id*.

The ACCA addressed Petitioner's request for a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), and found that a hearing was not necessary under the circumstances of Petitioner's case.  *Id*.  The ACCA found that:

> Appellant's factual allegations—even if true—would not result in relief.  *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).  Furthermore, the affidavits of the noncommissioned officer and Dr. Nevin "[do] not set forth specific facts but consist instead of speculative [and] conclusory observations . . .."  *Id*.  Moreover, "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of [appellant's claims].  *Id*.  Applying the first, second, and fourth *Ginn* principles to appellant's submission, we reject appellant's claim that he was likely exposed to Lariam.  Even assuming appellant was prescribed Lariam, there would still be no evidence he actually took it and was under its influence during the commission of his crimes.

*Id*.

The Court concludes that the military courts gave this claim the consideration contemplated by precedent and that Petitioner is not entitled to relief on this claim.

Petitioner also claims that the military courts erred in blocking Petitioner's evidence that certain Afghan witnesses, whom the Government described as farmers and gardeners, were actually terrorist bomb-makers.  On appeal, Petitioner claimed that the government violated his due process and discovery rights and committed fraud upon the court-martial.  *Bales*, 2017 WL 4331013, at \*2.  The ACCA found that:

> Appellant's claims are largely based on his post-trial discovery of "undisclosed evidence" that is not properly before the court.  Specifically, appellant moved this court to attach as an appellate exhibit a declaration from a defense consultant, who was retained post-trial, which purportedly "linked" several government witnesses to improvised explosive device (IED) events both before and after the charged offenses.  Although offered in the form of a sworn declaration, the information contained in the declaration and accompanying enclosure was of uncertain origin, authenticity, reliability, and classification.  Moreover, appellant's assertion that the information in the declaration was known to the government

prior to trial was made without supporting evidence.  Accordingly, after our initial consideration and subsequent reconsideration, we denied appellant's request to attach the declaration to the appellate record.  Therefore, any claim of relief based on this "undisclosed evidence" is unfounded.

*Id.*

The ACCA addressed Petitioner's claim as both a discovery violation and as a *Brady* violation.  The ACCA considered Petitioner's pretrial discovery requests and the government's response, which "included Bates-stamped and indexed files delivered to the defense in excess of 36,000 pages" and provided "broad discovery of classified evidence."  *Id.* at *3.  The ACCA noted that defense counsel acknowledged in their motion to compel discovery that they could not provide the exact information sought or the location of such evidence.  *Id.* at *4.  At a subsequent hearing, defense counsel stated that since the original filing of the discovery request, "most of these things have in fact taken care of themselves."  *Id.*  The ACCA noted that defense counsel raised a few outstanding discovery issues, but none of them "related to biometric data or derogatory information for any of the government's witnesses."  *Id.*  Therefore, the ACCA found that Petitioner's initial request for information about the character of the victims and government witnesses appeared to be "satisfied or abandoned."  *Id.*

The ACCA addressed Petitioner's request for character evidence related to a government witness.  *Id.*  The government sought to exclude the "unverified claim" that a witness's biometric data appeared to match the biometric data of a former Coalition Forces detainee.  *Id.*  The ACCA referred to the "rumors" that remained uncorroborated despite the government's efforts to substantiate it through the State Department.  The prosecutor stated that the government sought information from the State Department as to whether there was any document, investigation, or paperwork dealing with the matter, and the State Department responded that there was none.  *Id.*

The ACCA found that "the record at trial demonstrates that the government's prior knowledge of the claimed 'undisclosed evidence' was limited to unsubstantiated rumors. . . [and] [t]he government's efforts to substantiate the rumors left them uncorroborated." *Id*. at *5.  The ACCA found that "trial counsel exercised the diligence due under *Brady* and as required under R.C.M. 701(a)." *Id*.

The ACCA held that despite the apparent satisfaction or abandonment of Petitioner's discovery requests, the allegedly "undisclosed evidence" lacked materiality.  The ACCA held that:

> Even assuming the information pertaining to these witnesses was discovered and disclosed to appellant before trial, we see no scenario for the use of such evidence for impeachment during the presentencing phase of trial based on the witnesses' testimony. This is particularly true where, as in this case, appellant has disclaimed any lawful justification for his use of deadly force in the . . . stipulation of fact . . ."

*Id*.

Regarding the government's reference to the witnesses and victims as "innocent" or "farmers," the ACCA found that defense counsel made no objection to the government's use of either reference during the trial.  *Id*. at *6.   The ACCA found that Petitioner waived the issue, and even assuming he had preserved the issue for appellate review, it found "neither error in nor prejudice from trial counsel's argument."  *Id*. at 7.  The ACCA found that "[i]n its full context, trial counsel's reference to 'innocent people' or 'farmers', 'did not manipulate or misstate the evidence' . . . [i]n fact, the innocent people referred to were in their homes asleep when they were attacked by appellant." *Id*.

Petitioner argues that the military courts did not provide full and fair review in his case and urges the Court to undertake an expanded review of his claims for relief. The Court has considered this argument but concludes that this matter was given constitutionally adequate consideration in the military courts.

## V. CONCLUSION

The Court finds that Petitioner has failed to meet his burden to show that his military review was "legally inadequate" to resolve his claims. *See Williams*, 671 F. App'x at 721 (citing *Watson*, 782 F.2d at 144 (quotation omitted)). Because the military courts fully and fairly reviewed all of Petitioner's claims, the petition for habeas corpus must be denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the petition for habeas corpus is **denied.**

**IT IS SO ORDERED**.

**Dated June 9, 2020, in Kansas City, Kansas.**

<u>**S/ John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**